## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

BOSE CORPORATION,

        Plaintiff,

v.

        Case No. 1:09-cv-10222-WGY

LIGHTSPEED AVIATION, INC.,

        Defendant.

# LIGHTSPEED'S RESPONSE TO BOSE'S
# OMNIBUS MOTION *IN LIMINE*

Lightspeed responds to Bose Corporation's eleven "omnibus" motions *in limine* in the order raised.

### 1.    Non-Disclosed Evidence

Bose seeks to preclude Lightspeed from introducing certain exhibits at trial because Bose contends these exhibits have not been produced.

#### a)    Audio-Technica 910 and AP1300 headsets

The Audio-Technica 910 ("ATH-910") and AP1300 headset (Exhibits AL & AM) were disclosed to Bose in Lightspeed's October 2, 200**9** Invalidity Contentions.  (Dkt #23-2 at 10, 21, 31, 42, 51, 62 and 92).  Lightspeed informed Bose that it did not have the ATH-910 and AP1300 headsets, and that they were located at the Chicago law firm of Husch Blackwell Sanders ("Husch Blackwell") whom Dr. Buck had consulted for during ITC investigation No. 3370TA-



626 ("the ITC investigation") initiated and pursued by Bose.[1]  (Exhibit 2 – 10/30/2009 Letter from Rondini to Bowers at 2.)  Lightspeed further stated that Bose needed to contact Husch Blackwell if it wished to acquire the ATH-910 and AP1300 headsets for its own evaluation and testing.  To the best of Lightspeed's knowledge, Bose never contacted the Husch Blackwell firm.

Six months later, Lightspeed produced Dr. Buck's Opening Invalidity Expert Report which alleged, *inter alia*, that the '252 patent was invalid as being obvious in view of both the ATH-910 and AP1300 headsets. (Dkt. #74-5 at 26-27.)  Lightspeed again informed Bose that it did not have the headsets and that both headsets were returned to Husch Blackwell at the conclusion of the ITC investigation. (Exhibit 3 – 4/5/2010 Letter from LeRoy to Bowers.)  Lightspeed stated that Dr. Buck was relying upon and referring to the testing and analysis he performed during the prior ITC investigation.  Lightspeed again stated that Bose needed to contact Husch Blackwell if it wished to obtain the ATH-910 and AP1300 headsets for its own testing and evaluation. *Id.*  Again, it is not believed that Bose contacted the Husch Blackwell firm.

Lightspeed has explained on <u>two separate occasions</u> that the ATH-910 and AP1300 headsets were located and available from Husch Blackwell.  Bose has further known about both headsets since the beginning of the present suit, but has simply chosen not to request either

---

[1] In the ITC investigation, Bose accused multiple parties of infringing the claims of the '252 patent.  Husch Blackwell was one of the law firms that represented Audio Technica.  It was Husch Blackwell which contacted and retained Dr. Buck as an expert consultant.  During the course of the ITC investigation, Dr. Buck tested and provided a complete analysis that the claims of the '252 patent were obvious in view of both the ATH-910 and AP1300 headsets. (Exhibit 1 – Dr. Buck ITC Opening Expert Report at 2 & 6-13 & 18-19.)  Bose received a copy of Dr. Buck's expert report on May 28, 200**8** – eight months before filing the present suit.



headset from Husch Blackwell.  Accordingly, Lightspeed should be allowed to introduce the ATH-910 and AP1300 headsets at trial.[2]

### b) Edgar Villchur's "Reproduction of Sound"

Edgar Villchur's treatise (Exhibit DC) entitled "Reproduction of Sound" has been disclosed on two separate occasions during discovery.  First, Lightspeed disclosed the relevant textual excerpts from this treatise in its October 2, 2009 Invalidity Contentions. (Dkt. #23-2 at 55-56.)  Lightspeed also produced Chapter 12 of the Villchur treatise (which included the text excerpts disclosed in Lightspeed's October 2nd Invalidity Contentions) in an October 1, 2009 document production. (Exhibit 4 – 10/1/2009 – Letter from Rondini to Fish and Richardson.)

### c) Twiney, Robert "Some Transducer Design Considerations for Earphone Active Noise Reduction Systems"

In his April 1, 2010 Opening Invalidity Report, Dr. Buck references Robert Twiney's paper (Exhibit CP) entitled "Some Transducer Design Considerations for Earphone Active Noise Reduction Systems" to demonstrate the skill of art of a headset designer in the early 1980's.  The Twiney paper is a publicly known and available article that has been cited in numerous scientific articles and patents – including many that Bose have produced in this case.

Bose has never requested the Twiney paper from Lightspeed nor indicated that its non-disclosure was prejudicial.  Accordingly, the Court should not preclude Lightspeed from introducing the Twiney paper at trial.

---

[2] Indeed, Lightspeed has had to subpoena these headsets from Husch Blackwell to use them at trial.



### d) Zwicker & Fastl, "Psychoacoustics: Facts and Models"

In his April 30, 2010 Rebuttal Report, Dr. Buck references Zwicker and Fastl's treatise (Exhibit DE) entitled "Psychoacoustics: Facts and Models" to explain that it is well known in the relevant art that 1dB of sound is the minimum acoustical threshold that is audible to an ordinary person.  (Dkt. #74-22 at 8.)   The Zwicker and Fastl treatise is a publicly known and available treatise that has been cited in numerous scientific journal articles – including many articles that Bose has produced in this case.

Bose has never requested the Zwicker and Fastl treatise from Lightspeed nor indicated that its non-disclosure was prejudicial.  Accordingly, the Court should not preclude Lightspeed from introducing the Zwicker and Fastl treatise at trial.

### e) Tokhi, Osman and Veres, Sandor "Active Sound and Vibration Control"

Lightspeed is removing the Tokhi and Veres paper (Exhibit CO) entitled "Active Sound and Vibration Control" from the trial exhibit list.  Accordingly, Bose's request is now moot.

### f) Low Compliance Zulu Headset Design

Lightspeed is removing exhibits from the trial exhibit list pertaining to a "low-compliance driver" Zulu design.  Accordingly, Bose's request is now moot.

## 2. Opinion Testimony From Individuals Not Designated As Experts

Bose does not identify a single witness or a single issue to which this motion pertains. Rather than responding to such an abstract evidentiary objection, Lightspeed proposes that the Court address the evidentiary issue at trial, if necessary, at the time Bose believes a fact witness is improperly offering opinion testimony.



### 3.    Parol Evidence

Bose is correct that Lightspeed intends to introduce November 2002 e-mail communications between the parties' respective counsel because they are directly relevant to (1) Lightspeed's defense to Bose's claim of willful infringement, and (2) Lightspeed's claim that Bose breached the 2002 Settlement Agreement.

At the threshold, there is no "parol evidence" rule for claims of willful infringement. The e-mails in question expressly confirm that Lightspeed is permitted to develop and sell a headset having a "less complaint" driver (*i.e.*, speaker), without fear of infringing the '252 "high compliance driver" patent. In November 2002, Lightspeed's counsel informed Bose's counsel that Lightspeed was seeking "patent immunity" for future headset designs that used a "less compliant driver system":

> In other words, should Lightspeed decide later on to improve a current design by adding, for example, music plug-in, EQ adjustment, cell phone interface or **less compliant driver system** feature(s), it does not want to find itself in a position where Bose claims the updated design is a "new model" outside the scope of the patent immunity.

(Ex. 5 – 11/4/2002 email from Klitzke to Hieken, emphasis added.)

Bose's counsel responded stating that Lightspeed's conditions were "**acceptable**." (Ex. 5 – 11/4/2002 email from Hieken to Klitzke, emphasis added.) The following chart, taken from Bose's test data, positively confirms that the driver used in the headset accused of infringement in this case (Zulu) is a much "less compliant driver system" – 71% less – than the then-current driver design (THIRTY-3G).





Accordingly, the November 2002 e-mail exchange between the parties' respective counsel is direct evidence that Lightspeed was not willfully infringing Bose's '252 patent. Lightspeed did everything in its power to confirm, with Bose's express approval, that it had "patent immunity" for developing a headset such as the Zulu.

In its motion, Bose cites *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed.Cir. 2007) for the willful infringement test: "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  Nothing in *Seagate*, or any other case, prohibits Lightspeed from relying on e-mails to defend a case of willful infringement.

Bose contends that the e-mails are untimely, because they are dated five years before Lightspeed released the Zulu.  But the design of **future** Lightspeed headsets such as the Zulu was the whole point of the e-mail exchange: "should Lightspeed decide **later on** to improve a **current** design . . . ." (Ex. 5, emphasis added.)

6



Bose also cites Mr. Schrader's testimony regarding his personal state of mind, and in particular his belief that Lightspeed was permitted under the Agreement to develop the Zulu. These e-mails are not unrelated to the Agreement as Bose alleges.  On the contrary, they pertain directly to the creation and scope of the Agreement itself.  They expressly confirm and inform Mr. Schrader's understanding as to the scope of the Agreement, and in particular, to Bose's acceptance that the Agreement permits Lightspeed to develop a "less compliant driver system" in the future.

As to Lightspeed's claim for breach of contract, the use of parol evidence is proper where a disputed contract term is ambiguous.  *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48-49 (1st Cir. 2004).)  The covenant not to sue of the 2002 Settlement Agreement hinges on whether a particular headset design bears "no material relationship" to the claims of the '252 patent.  This contract phrase is, in a word, ambiguous.  Is a 10% increase in compliance "material?"  Is a 30% decrease in compliance "material" to the "high compliance driver" limitation of claim 1?  Even Bose acknowledges that contract ambiguities are to be construed against the drafter.  (Dkt. #93, Bose's Summary Judgment  Resp. Brf. at 6, *citing Kerkhof v. MCI WorldCom, Inc.*, 282 F.3d 44, 51 (1st Cir. 2002).)  **Bose** drafted the ambiguous "no material relationship" language on November 7, 2002.  (Dkt. #93-3, 11/2/02 e-mail from Hieken to Klitzke, Exhibit 6, Hieken Dep. Tr. at 51.)

Bose contends that the e-mails are automatically excluded by the integration clause of the 2002 Settlement Agreement which, according to Bose, "supersedes any other 'agreements.'" However, the e-mails do not pertain to some "other" agreement.  They pertain to the meaning and scope of the ambiguous terms of the 2002 Settlement Agreement that the parties executed.



Bose cites cases for the unremarkable proposition that parol evidence may not be introduced to contradict terms of the agreement, or to create ambiguity in an agreement where none exists. The e-mails do nothing of the sort. They merely clarify what the ambiguous contract language "no material relationship" (language which Bose drafted) actually means. This is a permissible use of such evidence. *Nadherny,* 390 F.3d at 48-49.

### 4.   Construction of 2002 Settlement Agreement

This motion is not a motion *in limine*. This is a motion for the Court to **<u>change</u>** the language of the contract.

At the threshold, Bose's proposed new words are no less ambiguous than the existing claim language. Bose wants to replace one set of vague words for another. For example, Bose wants to replace the contract term "material" with the *three* terms "relevant," "pertinent," or "important." These interpretations do nothing to assist the fact finder in resolving the contract dispute. For this reason alone, Bose's motion should be denied.

Should the Court endeavor to interpret the language however, Lightspeed contends that its proposed interpretation (*i.e.*, a compliance ratio that is *equal or less than* the "ANR models" identified in the agreement) **<u>resolves</u>** the contract ambiguity in a manner that is entirely consistent with the parties' mutual understanding of the "patent immunity" that the contract was originally intended to create for Lightspeed. Exhibit 5 is a November 4, 2002 e-mail from Bose's counsel to Lightspeed's counsel stating that a "less compliant driver system" is "acceptable" to Bose.



### 5.      Reference to Inequitable Conduct Counterclaim to Jury

Lightspeed does not intend to make reference to the inequitable conduct counterclaim to the jury.  However, Lightspeed may make reference to certain <u>facts</u> relevant to Lightspeed's inequitable conduct counterclaim, because those facts are also relevant to Lightspeed's '252 invalidity claim.  For example, as explained in detail in Lightspeed's February 23, 2010 brief, Bose's re-addition of John Breen as a co-inventor of the '252 patent in 2008 re-introduced U.S. Patent No. 4,922,542 ("the '542 patent") and other patents as prior art to the '252 patent, making them relevant to the validity issue under 35 U.S.C. §§ 102 and 103. (Dkt. #52 at 5.)

Lightspeed relies on the substance of the '542 patent in its invalidity claim, as well as the fact that the PTO did not ultimately consider the '542 patent during examination because of Bose's removal of John Breen as a co-inventor.  Because the '542 patent is listed on the face of the '252 patent, Lightspeed must be permitted to explain to the jury that the PTO dropped its substantive consideration of the patent after Bose removed Breen as a co-inventor in 1991– an act that was nullified in 2008 when Bose was forced to re-add Breen as a co-inventor due to his testimony that he was, in fact, always an inventor of the '252 patent.

### 6.      Lightspeed's Alleged Use of Bose's QuietComfort Trademark

Bose makes a bald contention that Lightspeed's senior use of the "QuietComfort" trademark is not relevant to "any issue to be decided by the jury."  Bose does not explain this contention, or cite any supporting authority.  For this reason alone, its motion should be denied.

Lightspeed's senior use of the QuietComfort mark is directly relevant to Lightspeed's claim for concurrent use of the mark, as pled in its November 2009 Amended Answer and Counterclaim.  (Dkt. #28 at 8-10, 11.)  Lightspeed began using the "QUIET COMFORT" mark



commercially in 1996 — more than four years before Bose applied for its trademark registration for the mark in 2000 (Dkt. #28, Counterclaim ¶¶ 5, 7), and more than six years before Bose began using the mark commercially in 2002 (*Id.*, ¶ 9).  Shortly after Bose began using the mark, Lightspeed sued Bose for trademark infringement in Oregon District Court.  (*Id.*, ¶10.)  In that lawsuit, Lightspeed sought an order cancelling Bose's trademark registration pursuant to 15 U.S.C. §1119. (*Id.*, ¶12.)

In December 2002, Bose and Lightspeed entered into a settlement agreement to resolve the Oregon trademark litigation.  (*Id.*, ¶13.)  Bose agreed to license Lightspeed's headset products (including certain "improvements") under the '252 patent in exchange for Lightspeed's agreement to phase out commercial use of its "QUIET COMFORT" mark.  (*Id.*, ¶¶14-15.)  This agreement permitted both parties to sell their respective headset products without the threat of patent or trademark litigation from the other.

Lightspeed contends that Bose's filing of this lawsuit is a breach of the settlement agreement.  (*Id.*, ¶¶ 20-21.)  If Lightspeed knew that Bose was not going to honor its patent license, Lightspeed would not have agreed to phase out the use of its "QUIETCOMFORT" mark in commerce and all the goodwill that Lightspeed had attained with that commercial use — goodwill that Lightspeed cannot recover.

Lightspeed's senior rights to the QuietComfort mark are directly relevant to, and in fact give rise to, Lightspeed's claim against Bose for concurrent use in the mark.  Accordingly, Bose's unsubstantiated motion should be denied.



### 7.    Confidential Treatment Of Certain Bose Financial Information

Bose filed this case.  Bose and its counsel are no strangers to patent litigation.  Bose knew at the time it filed the complaint that its financial documents would be subject to scrutiny and squarely relevant to the damages aspect of the case.  Now, after Lightspeed has developed compelling defenses concerning Bose's now-expired '252 patent, Bose seeks to cloak these key aspects of the very litigation it initiated.

This Court favors public trial proceedings.   Accordingly, Bose's request should be denied.

### 8.    Legal Opinions by Lightspeed's Technical Experts

Lightspeed does not offer Dr. Buck as a legal expert in this case.  Dr. Buck is a technical expert, and he opines on technical issues that Bose does not take issue with.  Of course, his analysis falls within a legal framework that he must be familiar with to perform his analysis properly.  Bose's selective citations to Dr. Buck's expert report and deposition testimony (neither of which are trial evidence) are taken entirely out of context.  Lightspeed suggests that the Court meter Dr. Buck's actual trial testimony, in context, before considering any exclusionary rulings.

Bose culls a statement from Dr. Buck's report that "the Zulu headset is licensed."  Of course, this statement is in the context of Dr. Buck's *technical* analysis made to confirm that "improvements" to the Zulu headset does not bear a "material relationship" to the claims of the '252 patent – an analysis that Bose does not take issue with.  (Dkt. #74-5 at 65-68.)

Bose also takes issue with Dr. Buck's statement that Bose had a duty to disclose certain key prior art to the PTO during its examination of the '252 patent.  Again, this conclusion was in the larger context of Dr. Buck's *technical* analysis that the prior art in question was both



"material" to the patentability of the pending claims, and "not cumulative" to prior art that had already been disclosed – the litmus test for a patentee's duty of disclosure under 37 C.F.R. § 1.56.  (Dkt. #74-5 at 69.)  Bose cites no case, and there is none, requiring that a technical expert performing such a technical analysis must be "an expert in Patent Office procedure or regulations."  Regardless, the inequitable conduct issue will be tried to the Court in this case, so Bose's motion *in limine* is unnecessary.

### 9.    The European Patent Office's Decision Regarding Bose's European Patent No. 414,479

Bose's '479 patent is the European counterpart of the '252 patent.  Lightspeed asserts that the claims of the '252 patent are obvious and invalid under 35 U.S.C. §103 in view of the evidence and analysis set out in the EPO's decision to revoke the '479 patent. (Dkt. #74-5 – April 1, 2010 Invalidity Report of Marshall Buck at pg. 45-47).

The EPO revoked (invalidated) the claims of the '479 patent in view of prior art and arguments made during an opposition proceeding that was initiated by Sennheiser Electronic – a German competitor of Bose.  Specifically, the EPO agreed with Sennheiser's arguments and invalidated the claims of the '479 patent for lack an inventive step – which is "the equivalent of obviousness in United States practice[.]"  *Warner-Lambert Co. v. Teva Pharmaceuticals USA*, 289 F.Supp.2d 515, 531 (D. N.J. 2003).  Because the obviousness standard used by the EPO (*i.e.*, inventive step) is the equivalent standard used by the PTO, the EPO's decision invalidating the '479 patent is relevant and admissible evidence as to whether the claims of the '252 patent are invalid under 35 U.S.C. §103. *American Infra-Red Radiant Co. v. Lambert Industries, Inc.*, 360 F.2d 977, 987 (8th Cir. 1966) (A foreign patent office decision regarding the claims of a foreign patent is relevant and admissible evidence whether the claims of an equivalent U.S. patent is "obvious" under 35 U.S.C. §103.)



Bose's assertion of prejudice also appears to be a last ditch attempt to have the EPO decision excluded because it has failed to prepare any admissible rebuttal defense. In his April 1, 2010 report, Dr. Buck explained and adopted the EPO decision. (Dkt. #74-5 – April 1, 2010 Invalidity Report of Marshall Buck at pg. 45-47). Bose's expert, Dr. Koopmann, should have provided a rebuttal in his April 30, 2010 report. He failed to do so. Bose now appears to have recognized that no rebuttal defense exists and is now using this motion as a way to escape its own inability to rebut the logic of the EPO decision.

Lastly, the Federal Circuit does not "endorse a *per se* exclusion of evidence related to foreign patent prosecution" – as Bose implies. *Phizer Inc. v. Ranbaxy Laboratories Ltd.*, 2005 WL 3525681, *3 (D. Del. 2005). Rather, the Federal Circuit believes that all relevant evidence must be considered – including decisions from foreign patent offices. *Id.*; *Caterpillar Tractor Co. v. Barco, S.P.A.*, 714 F.2d 1110, 1116 (Fed.Cir. 1983) (Holding that "instructions to foreign counsel and a representation to a foreign patent offices should be considered . . . when such matters comprise relevant evidence[.]"); *Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 733 (Fed. Cir. 1997) (Holding that "representations made to foreign patent offices are relevant to determine whether a person skilled in the art" would find the limitations of a U.S. patent obvious.) Accordingly, the Court should deny Bose's request.

### 10.   Reference To Or Display Of The Johnson Or Wurtz Telex ANR Headsets As Prior Art To Jury

In its summary judgment order, this Court has determined that the Telex ANR headset anticipates claim 1 of the '252 patent. There is no dispute that the headset is "prior art" to the filing date of the '252 patent. The Court has deferred to the jury the issue of whether Bose can



establish an earlier "priority date" that is earlier than the date (July 18, 1989) that the Telex ANR headset was indisputably demonstrated to the public at the Airshow in Oshkosh, Wisconsin.

The Wurtz and Johnson headsets are physical embodiments of the Telex ANR headset that is at the center of Lightspeed invalidity defense with respect to the asserted '252 patent. Obviously, the jury should be permitted to inspect this physical evidence in its deliberations. Using part numbers that are physically etched into the Johnson and Wurtz headsets, Dr. Buck has established that these headsets are identical physical manifestations of Mr. Johnson's original engineering drawings dated March 1989.  This evidence was presented to the Court in Lightspeed's summary judgment briefing, and the Court recognized in its summary judgment order that Bose has no real contrary evidence.  It is unthinkable that the jury should be precluded from having access to the physical embodiments of this key evidence.

Bose contends that these headsets should be precluded because they may have been manufactured shortly after Bose filed its application for the '252 patent in August 1989. However, because the headsets were manufactured generally contemporaneously with Mr. Johnson's 1989 conception and in the ordinary course of business at Telex – almost two decades before this litigation was initiated – they are admissible at trial.  *Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1350-1351 (Fed. Cir. 2001); *Rothschild v. Cree, Inc.*, 2010 WL 1909545, *28 (D. Mass. 2010).  Accordingly, the Court should deny Bose's request.



**11.    Rodney Crawford's Opinion Testimony On The Issue Of Patent Infringement Damages**

    **a)    Mr. Crawford's Pertinent IP Valuation and Licensing Experience**

In its eleventh and final motion, Bose contends that Mr. Crawford is a "professional witness" who lacks "real world experience" and should be precluded from offering damages opinions in this case.  The exact opposite is true.

As Bose knows from Mr. Crawford's deposition, he spent the years 1997 through 2002 climbing through the ranks at Arthur Anderson, ultimately becoming an equity partner in the firm.  The consulting projects that Mr. Crawford handled at the firm included due diligence for valuing and negotiating his clients' intellectual property rights.

> Q.    And you made reference to due diligence activities.  Could you describe an example of that?
>
> A.    Yes.  We would be engaged by clients, frequently our audit clients, but sometimes  by companies that were not otherwise clients, to go and assist them in terms of the investigation of the operations and financial situation of a target company to assess, first of all, whether there was a desirable acquisition  target, and **the indications of value looking at the company's operations and its assets of all types, including its intellectual property. Assisting the company in valuing those assets and negotiating and closing a transaction ultimately if that was the decision that the client made.**

(Ex. 7, Crawford Dep. Tr. at 8-9, emphasis added.)

From 2002 through the present, Mr. Crawford has been the managing member of Crawford Financial Consulting, LLC.  At that firm, Mr. Crawford has had responsibilities that are similar to those he had at Anderson.  (*Id.* at 11.)

At Mr. Crawford's deposition, Bose inquired about his relevant experience generally.

> Q.   What relevant experience do you bring to this case?



A.   Well, I am accredited in business valuation by the American Institute of CPAs.  A component of that general field of knowledge is the valuation of intellectual property assets.  I have worked as a consultant, an expert in many previous cases involving claims related to patents and other forms of intellectual property.  **I have been involved in valuing intellectual property.  I have had clients that were engaged in licensing activities, both as a licensor and licensee, and have worked with them in terms of those arrangements, and in some cases, negotiation of those arrangements.** I've worked with counsel involved in intellectual property disputes in terms of negotiating settlements.  When I was involved as a partner in the audit practice, one of our areas of practice was assisting clients in connection with Section 482, if I'm remembering the section correctly, transfer pricing negotiations with the Department of Treasury, which typically involved my assistance to the tax department in terms of valuation transfers of property between domestic and international affiliated companies, **including licensing of intellectual property**.  We performed **intellectual property valuations** in the context of Statement of Financial Accounting Standards 141, 142 and 157.  Those are the things that I would -- oh, and then just my experience in the general area of damages analysis and accounting analysis in terms of having analyzed hundreds of lost profit claims and claims for other forms of damages as well.

(*Id.* at 12-13, emphasis added.)

Bose specifically questioned Mr. Crawford regarding his personal participation in "20 or so" patent licensing negotiations, including the "business factors" that Mr. Crawford considered in those negotiations.  (*Id.* at 41-45.)  Mr. Crawford also gives seminars concerning intellectual property valuation and damages.  (*Id.* at 47.)  Mr. Crawford was periodically called upon to perform intellectual property royalty audits to confirm compliance with patent licensing terms.  (*Id.* at 48-49.)

It bears mentioning that **Bose's** expert, Mr. Dansky, was retained in "30 or 40" different litigation matters during the four years that he spent with Coopers & Lybrand.  (Ex. 8, Dansky Dep Tr. at 11-13.)  After leaving Coopers, Mr. Dansky went to the Peterson Consulting Group,



where he continued doing "expert work in IP cases." (*Id.* at 15.) At the time he was engaged in this case, Mr. Dansky was a principal of the Brattle Group (www.brattle.com), a firm that specializes in expert litigation consulting. Mr. Crawford clearly possesses the credential necessary to provide damage opinions in this case. No court has ever held contrary.

### b) Mr. Crawford's Damages Analysis

In its shotgun-like attacks on Mr. Crawford's damages analysis, Bose consistently overlooks the fact that Bose, not Lightspeed, bears the burden of proof. *Dow Chemical Co. v. Mee. Industries, Inc.*, 341 F.3d 1370, 1381 (Fed.Cir. 2003).

In addition, each of the issues that Bose raises are highly fact-intensive, often matters of degree. In *Micro Chemical, Inc. v. Lextron Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003), the Federal Circuit held that the trial court's role in adjudicating *in limine* motions was not, in the *Daubert* context, to determine the veracity of the underlying facts. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), the Supreme Court held that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the "traditional and appropriate means of testing expert testimony."

As explained in each instance below, there is no basis to exclude any of Mr. Crawford's analyses.

### (1) The Panduit Factor No. 1 – Demand For The Patented Product

Bose presently seeks damages in the form of "lost profits" and, alternatively, in the form of a "reasonable royalty." The so-called "*Panduit* factors" pertain to Bose's lost profits damages



theory.[3]  Because Bose bears the burden of proof on damages at trial, and because Bose has not identified which of its two damages theories it is going to pursue at trial, this portion of Bose's motion is premature.  Mr. Crawford's *rebuttal* to Bose's application of the *Panduit* factors should be addressed in the event Bose ultimately pursues its lost profits damages theory at trial.

Mr. Crawford's rebuttal analysis did not misapply *Panduit* factor No. 1 (demand for the patented product).  Mr. Crawford calls Mr. Dansky's lost profits claim into question with respect to *Panduit* factor No. 1 because it is clear from the record that a panoply of non-patented features drove sales of Lightspeed's Zulu headset.  (Ex. F to Bose's Motion *In Limine*, at ¶48.)  In particular, Bose takes issue with the following two statements in Mr. Crawford's report:

- "If it is determined that something other than the patented technology drove the demand for the product, the product would not meet the 1st Panduit Test."
- "The Dansky report does not identify any evidence that any consumer purchased a Zulu because it had a 'high compliance driver.'"

In both instances, Mr. Crawford was merely stating that if no nexus *at all* exists between the claimed invention and demand for the patented product, the 1st factor is not met.  These statements are an accurate representation of the law.  While it is true that the patented feature need not be the *sole* determinate of customer demand for the patented product, this Court has **repeatedly** held that the patented invention must "contribute . . . substantially" to consumer demand for the product.  *Haemonetics Corp. v. Baxter Healthcare Corp.*, 593 F.Supp.2d 303, 305 (D.Mass. 2009), *citing Bose Corp. v. JBL, Inc.*, 112 F.Supp.2d 138, 159 (D.Mass. 2000), *aff'd* 274 F.3d 1354 (Fed.Cir. 2001); *see also*, Butler, *Patent Infringement Compensation and*

---

[3] The Federal Circuit has emphasized that the four-factor *Panduit* analysis is not an exclusive test for lost profits.  *See, e.g. Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1548 (Fed.Cir. 1995).



*Damages*, §5.02[1][a], Law Journal Press, 2010. In *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n. 13 (Fed.Cir.1995) (*en banc*), the Federal Circuit held that "lost profits awards have been dependent, *inter alia*, on proof that consumer demand for the patentee's goods is **created by the advantages of the patented invention**." (Emphasis added.) Whether one feature of a patented product, or another, "contributes substantially" to customer demand for a patented product is obviously a fact issue for jury resolution.

Bose contends that Mr. Dansky's analysis is at odds with the Federal Circuit's ruling in *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1329-1330 (Fed.Cir. 2009). According to Bose, "general demand" for a product is all that is required to meet the first *Panduit* factor. (Bose's Brf. at 17.) Nowhere does the Federal Circuit hold in *DePuy Spine* that "general demand" for a product is sufficient to meet the first *Panduit* factor. In that case, Medtronic sought to overturn a jury's entire lost profits award because the patentee failed to show that demand for the product was driven solely by the patented feature. *Id.* The Federal Circuit held that a party *advancing* a lost profits theory need not allocate consumer demand "among the various limitations recited in a patent claim."

In this case, Mr. Crawford's *rebuttal* merely states that Mr. Dansky has failed to draw *any* connection between the '252 patent and demand for the Zulu headset. Mr. Crawford merely identified the reality that there is no evidence whatsoever that the "high compliance driver" aspect of the alleged '252 invention drove any consumer to demand a Zulu headset. This is simply an factual input to the jury's determination as to whether the first *Panduit* factor is met, *i.e.* whether the "advantages" of the invention at issue "contribute substantially" to the demand for the Zulu. *Rite-Hite*, 56 F.3d at n.13; *Haemonetics*, 593 F.Supp.2d at 305. (D.Mass. 2009).



Bose also challenges Mr. Dansky's opinion that "evidence of product sales, **without more**, is not evidence of demand for a patented product." (Emphasis added.)  That is the law. *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453 (Fed.Cir. 1991)(affirming denial of lost profits award finding "not only has Slimfold failed to show that *buyers* of bi-fold metal doors specifically want a door having the advantages of the Ford patent, but the fact (found by the district court) that neither Slimfold's nor Kinkead's market share changed significantly after introduction of the 'new' doors is very probative of the contrary conclusion.") (italics in original).

### (2)    The Panduit Factor No. 2 – Acceptable Non-Infringing Substitutes

Bose takes issue with Mr. Crawford's opinion regarding the "acceptability" of non-infringing substitutes that were available in the market at the time of the alleged infringement, undermining Bose's claim for lost profits.  At the threshold, Bose – not Lightspeed – bears the burden of proving damages.  *Dow Chemical Co.*, 341 F.3d at 1381.  Thus, to establish lost profits, Bose – not Lightspeed – bears the burden of proving an "**absence**" of acceptable non-infringing alternatives to the patented headset.  *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).  The "acceptability" of an alternative to a patented design in the marketplace is obviously a highly-factual jury issue that will depend on the unique circumstances of the particular case at hand.

Mr. Crawford relies on two key facts for his opinions concerning the availability of alternatives in the market.  First, the 2002 Agreement between the parties expressly authorizes Lightspeed to sell its THIRTY-3G active noise reduction aviation headset.  (Ex. F to Bose's Motion *In Limine*, at ¶55.)  This headset is obviously an "acceptable" non-infringing alternative because Lightspeed has sold thousands of these headsets over the years.  Second, Bose's market



research identifies and studies several other competitors in its aviation headset market that sell competing aviation noise cancelling headsets. (Ex. F to Bose's Motion *In Limine*, at ¶55.) If these headsets were not acceptable alternatives, then why would Bose consistently consider them competitive peers in its internal market studies?

The acceptability of the alternatives that Mr. Crawford has identified is a factual issue best left for the jury's consideration.

### (3)    The Panduit Factor No. 4 – Profit Patentee Would Have Made

As Mr. Crawford explained in his report, he was forced to use Lightspeed's profits as a surrogate for Bose's profits in the lost profits analysis because Bose's profits were unsubstantiated and "implausibly high." (Ex. F to Bose's Motion *In Limine*, at ¶¶41, 43, 84.) Certainly, the law does not require Mr. Crawford to blindly adopt a plaintiffs' unsubstantiated and objectively unreasonable profit figure. As explained above, it is Bose's burden at trial, not Lightspeed's, to establish the profit that Bose would have made but for Lightspeed's alleged infringement. Consideration of Lightspeed's demonstrated and reliable profitability is, at the very least, a factor in determining the veracity of the figure Bose's Mr. Dansky.

### (4)    Reasonable Royalty Analysis

Mr. Crawford understands that the reasonable royalty analysis begins with the assumption that a patent is valid and infringed. (Ex. F to Bose's Motion *In Limine*, at ¶100.) This case is unique because in 2002, the parties entered into a Settlement Agreement that authorized Lightspeed, subject to certain conditions, to improve its headsets without fear of an infringement claim by Bose. Mr. Crawford opined that Lightspeed would have brought that 2002 Settlement Agreement to the hypothetical negotiation table (in 2007) claiming, as it does in



this case, that it has a contractual right to "infringe" the '252 patent with the Zulu headset.  Mr. Crawford opines that this fact would have tended to lower the royalty rate that the parties would have agreed to had the Settlement Agreement not existed in the first place.

Bose also takes issue with two license agreements that Mr. Crawford considers in his reasonable royalty analysis.  Both of the agreements were between Lightspeed and Bose – the very parties of the hypothetical negotiation at issue in this case.  The 2002 agreement pertained to the '252 patent-in-suit, and the 2006 agreement pertained to technology used in aviation headsets such as those at issue in this case.  Obviously, these two agreements are compelling inputs to the range of royalties that the parties would have agreed to in a hypothetical negotiation in this case.  Bose challenges these agreements because they arose following litigation between the parties.  However, such agreements can be relevant to the hypothetical negotiation, especially in this case where they relate to the same parties and the same or similar patents and technology.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ("This court observes as well that the most reliable license in this record arose out of litigation.").

Bose motion on Mr. Crawford should be denied.

<div style="text-align:right">

Respectfully submitted,

**BROOKS KUSHMAN P.C.**

</div>

Dated:   August 27, 2010

<div style="margin-left:40%">

  /s/   John S. LeRoy
MARK A. CANTOR
MARC LORELLI
JOHN S. LE ROY
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone:  (248) 358-4400
Facsimile:  (248) 358-3351
Email   jleroy@brookskushman.com

*Attorneys for Defendant*

</div>



## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that on <u>August 27, 2010</u>, I electronically filed the foregoing with **LIGHTSPEED'S RESPONSE TO BOSE'S OMNIBUS MOTIONS *IN LIMINE*** the Clerk of the Court for the District of Massachusetts using the ECF System which will send notification to the following registered participants of the ECF System as listed on the Court's Notice of Electronic Filing:  Steven A. Bowers, Mark A. Cantor, Charles Hieken, Andrew R. Kopsidas, John LeRoy, Marc Lorelli, Gina M. McCreadie, Mark D. Robins.

I also certify that I have mailed by United States Postal Service the paper to the following non-participants in the ECF System:  None.

**BROOKS KUSHMAN P.C.**

   __/s/ John S. LeRoy_____
MARK A. CANTOR
MARC LORELLI
John S. LeRoy
1000 Town Center, Twenty-Second Floor
Southfield, Michigan 48075
Telephone:  (248) 358-4400
Facsimile:  (248) 358-3351
Email:  mcantor@brookskushman.com
       mlorelli@brookskushman.com
       jleroy@brookskushman.com

*Attorneys for Defendant*
*LIGHTSPEED AVIATION, INC.*

